IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| KAREN H. EGELKAMP<br>2509 E. Allegheny Avenue<br>Philadelphia, PA 19134 | : | |
| | : | |
| Plaintiff, | : | NO. |
| | : | |
| *v.* | : | |
| | : | |
| ARCHDIOCESE OF PHILADELPHIA<br>222 North 17th Street<br>Philadelphia, PA 19103 | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

---

## **COMPLAINT**

Plaintiff, Karen H. Egelkamp ("Egelkamp"), by and through her undersigned counsel, brings this action against Defendant, Archdiocese of Philadelphia, because of its unlawful discrimination in refusing to provide her with fair and/or equal pay and by retaliating against Egelkamp by terminating her employment for questioning the Defendant's conduct. The discrimination and retaliation that the Defendant engaged in is based upon Egelkamp's gender. The Defendants conduct is in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Equal Pay Act of 1963.

## **JURISDICTION AND VENUE**

1.     This action arises under Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act of 1963.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), as the events giving rise to the claims occurred in this district, and the defendant may be found in this district.

## PARTIES

4.      Plaintiff, Karen H. Egelkamp ("Egelkamp" or "Plaintiff") is an adult individual and a citizen of the United States who resides at 2509 E. Allegheny Avenue, Philadelphia, Pennsylvania 19134.

5.      Defendant, Archdiocese of Philadelphia ("Archdiocese" or "Defendant") is a Pennsylvania 501(C)(3) religious organization, and is located at 222 North 17th Street, Philadelphia, Pennsylvania 19103.

6.      Archdiocese of Philadelphia has been, at all relevant times, an employer as defined by 42 U.S.C. § 2000e(b), 43 P.S. § 954, and Phila. Code § 9-1102(1)(h).

## FACTS

7.       Egelkamp was hired by Defendant in 2001, as a full-time Executive Secretary.

8.      As the Executive Secretary she reported to Arthur Friedman ("Friedman") whose position in 2001 was Director of Capital Projects.

9.      The Capital Projects department supervised large scale investment projects, including the upgrading and repair of Archdiocese buildings and real estate.

10.     In 2003, the Capital Projects department was merged with the Office for Real Estate Services. However, the Capital Project department and the Office for Real Estate Services continued to operate independently.

11.     After the merger, Joseph Corbett, Assistant Director of the Office for Real Estate Services and Friedman remained in charge of their respective departments.

12.     In 2005, Friedman's position was changed to "Capital Projects Coordinator."

13.     As Coordinator, Friedman had a plethora of duties and responsibilities such as negotiating construction contract terms, monitoring projects, scheduling and attending meetings, confirming projects' source of funding, regularly communicating with pastors, project managers and architects in addition to many other duties.

14.     Friedman's base salary as Coordinator, was $97,000 with an annual bonus of $4,000–$8,000.

15.     As Coordinator, Friedman's also had minimal involvement with the Real Estate Office, which dealt with all other real estate matters.

16.      Friedman's limited involvement in the Real Estate Office consisted of proofing and signing letters or memos and other minor tasks involving internal paperwork.

17.     In May 2011, James J. Bock, Jr. ("Bock"), the head of the Real Estate Office, asked Egelkamp to assist him by absorbing the Real Estate duties of another employee who had resigned.

18.     Bock assured Egelkamp that these additional duties would only be temporary until someone else was hired.

19.     The additional duties consisted of handling administrative tasks for the Archdiocesan Real Estate Advisory Committee.

20.     These administrative tasks included scheduling, coordinating catering, attending meetings, recording meetings, preparing the agenda and minutes and forwarding the agendas to committee members.

21.     Bock was aware that these additional duties were time consuming and that Egelkamp would be unable to perform them during normal work hours in conjunction with her prior existing work duties as executive secretary.

22.     Bock approved the purchase of a laptop which Friedman issued to Egelkamp for the express purpose of performing additional duties from home after regular work hours.

23.     From May of 2011 until September of 2016 Egelkamp worked in excess of 60 to 70 hours per week but never received overtime.

24.     In November 2011, Friedman's employment with the Defendant was terminated.

25.     Following Friedman's termination, Bock directed Egelkamp to assume all of Friedman's duties as the Capital Projects Coordinator.

26.     She was also expected to continue the additional duties of the Archdiocesan Real Estate Advisory Committee, as well as her original duties as Executive Secretary.

27.     Egelkamp's base salary was $44,800.

28.     Deacon Tom Croke ("Croke") was hired in or around 2012 to replace Bock as Director for Real Estate Services.

29.     Eglekamp's duties and responsibilities did not change under Croke and she continued to work in excess of 60 to 70 hours per week without overtime.

30.     In May of 2016 the Wage and Hour Division of the Department of Labor announced a final rule under the Fair Labor Standards Act ("FLSA") for the payment of overtime.

31.     Under this new rule which was effective in December of 2016 the minimum pay requirement for overtime was increased to $47,476.00 and Egelkamp was eligible for overtime.

32.     In September 2016, in response to the new rule the Archdiocese held mandatory meetings with employees and Human Resources Office ("HR") in order to explain new policies on the maintenance of timesheets and eligibility for overtime.

33.     At this meeting, all employees were provided with sample timesheets that they were now required to complete and submit to their Department Supervisor.

34.     According to HR, the Department Supervisor was supposed to receive the document for pay purposes and keep it on file for three years.

35.     Egelkamp's Department Supervisor was Croke.

36.     When Egelkamp attempted to submit her timesheets to Croke he declined to accept them and directed her to maintain them in her own file.

37.      Egelkamp responded that HR had instructed her to submit the report to a supervisor and ask for a signature.

38.     Despite her request and reference to the instructions from HR, Croke refused to sign Egelkamp's timesheets by stating that the Archdiocese would not approve overtime so it was a useless exercise.

39.      Egelkamp was aware that based on the new rules of the Department of Labor, she was eligible for overtime and could be earning significantly more in income based on her routinely working 60 to 70 hours per week.

40.     When she raised the issue of overtime pay with Croke he responded that "everyone works extra hours, and no one gets paid for it."

41.     In the early spring of 2017 Egelkamp learned for the first time that the she had been assigned the salaried position of "Coordinator of Capital Projects" in the Archdiocese' organizational chart.

42.     Egelkamp had been performing the job of acting Capital Projects Coordinator since 2011 but she did not learn the Archdiocese was carrying her in that position until a colleague drew to her attention the reference in the Archdiocese directory listing "Karen Egelkamp as the Capital Projects Coordinator".

43.     Upon information and belief, the Archdiocese made the decision to slot Egelkamp into the coordinator position in order to make her ineligible for overtime.

44.     In early 201y, once Egelkamp realized that she was holding the position of Capital Project's Coordinator she went to Croke and complained about the pay disparity between herself and Friedman.

45.     Specifically, she was in the same job as Friedman, performing the same duties and had equal or greater experience than Friedman in the area of construction.

46.     To her inquiry, Croke disingenuously replied "obviously there is a difference between you and Art Friedman."

47.     When Egelkamp asked what the difference was, Croke looked up from his cell phone and said, "think about it" before returning his attention to his cell phone.

48.     Egelkamp was performing the same job as Friedman: Capital Projects Coordinator.

49.     The only difference between Egelkamp and Friedman was their salaries and genders.

50.     Croke at a minimum participated in or approved of the decision to deny Egelkamp overtime and place her into the position of Capital Projects Coordinator without providing her with pay equal to her male predecessor, Freidman.

51.     Croker has expressed animus toward female professionals in the workplace.

52.     In February 21, 2017, because Egelkamp's co-worker was sick and out of the office she opened the mail on the co-worker's counter.

53.     The mail contained a lease agreement sent from a parish for review. It required immediate attention and Egelkamp brought the lease to Croke to inform him of its urgency.

54.     Croke responded that Egelkamp needed to send it up to the Legal Office for review.  Egelkamp questioned why it needed to go to legal because she was under the impression that Croke reviewed real estate documents.

55.     Croke then told her that he did not review the documents because he had asked for authority to sign real estate documents but was denied that authority by the female general counsel.

56.     Croke concluded the conversation by saying, "that's the problem with female attorneys, the power goes to their heads."

57.     In response to Croke and the Archdiocese's decision to deny her overtime and deny her equal pay, Egelkamp complained to Croker and relayed her concerns to friends and colleagues.

58.     Egelkamp made it clear to Croke and the other members of management at the Archdiocese knew that she believed she was entitled to fair and equal compensations.

59.     Rather then address the issues with Egelkamp's pay the Archdiocese chose instead to retaliate against her and terminate her employment.

60.     On November 14, 2017, Defendant terminated Egelkamp because of the alleged unauthorized use of meal tickets.

61.     Meal tickets are used to purchase meals in the Archdiocese cafeteria.

62.     Croke alleged Egelkamp made improper use of meal tickets.

63.     This allegation was false.

64.     In the early 2000s prior to Friedman's departure, he instructed Egelkamp to use meal tickets when she worked through lunch or dinner; Egelkamp acted accordingly.

65.     Croke received a report each month that showed how meal tickets were being used. He also knew that Egelkamp was in charge of the meal tickets in her department.

66.     In fact, Croke himself had used meal tickets that he requested and received from Egelkamp in the past.  Croke also directed his secretary Diane Berardinelli to obtain meal tickets from Egelkamp.

67.     Moreover, Croke acknowledged that Egelkamp did not violate any meal ticket policy because there was no policy regarding the use of meal tickets.

68.     When an issue arose about the use of meal tickets the Archdioces used it as an opportunity to establish a pretext to terminate Egelkamp in retaliation for her complaints about unequal pay and overtime.

69.     Defendants acknowledged Egelkamp as the Capital Projects Coordinator in part because she was performing the job and in part to make her ineligible for overtime.

70.     By changing her title in order to avoid overtime the violated the Equal Pay Act because paid her a wage at a rate less than the rate the paid her male predecessor for the same work.

71.     The Defendant's discriminatory compensation, retaliation and harassment is a result of the Plaintiff's sex.

## COUNT I
## VIOLATION OF TITLE VII: DISCRIMINATION

72.     Egelkamp incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

73.     Defendant discriminated against Egelkamp with respect to her compensation, terms, conditions, and/or privileges of employment because of her sex.

74.     Defendant also discriminated against Egelkamp by improperly limiting, segregating and/or classifying her in a manner that deprived her of employment opportunities and/or otherwise adversely affected her status as an employee because of her sex.

75.     By discriminating against Egelkamp based on her sex, Defendant violated Title VII.

## COUNT II
## VIOLATION OF TITLE VII: RETALIATION

76.     Egelkamp incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

77.     But for Egelkamp's complaint to Defendant, through Croke, about her unfair and unequal compensation, she would not have been terminated from employment with Defendant.

78.     By retaliating against Egelkamp for her complaints about discrimination, Defendant violated Title VII.

## COUNT III
## VIOLATION OF EQUAL PAY ACT OF 1963: DISCRIMINATION

79.     Egelkamp incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

80.     Defendant discriminated against Egelkamp by paying her a wage at a rate less than the rate at which the Defendant pays wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.

81.     The Defendant's conduct is a malicious and/or reckless act of discrimination.

82.     By discriminating against Egelkamp based on her sex, Defendant violated the Equal Pay Act of 1963.

## COUNT IV
## VIOLATION OF EQUAL PAY ACT OF 1963: RETALIATION

83.     But for Plaintiff's complaint to Defendant, through Deacon Croke, about her unfair and unequal compensation, Plaintiff would not have been terminated from her employment with Defendant.

84.     By retaliating against Egelkamp for her complaints about the continued discrimination, Defendant violated the Equal Pay Act of 1963.

## COUNT V
## (FSLA – RETALIATORY TERMINATION & FAILURE TO PAY WAGES)
## 29 U.S.C. §201 *et seq.*

85.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

86.     As set forth more fully above, Plaintiff sought payment of wages or equity in exchange for the overtime hours and salary for which she was not compensated during her employment with Defendant, and informed Defendant that refusal to give her the same was improper.

87.     Instead of compensating Plaintiff, Defendant terminated Plaintiff as retribution and retaliation for engaging in protected activity in direct violation of 29 U.S.C. § 215, et seq.

88.     Further, Defendant failed to pay Plaintiff the wages that she earned and/or was entitled after terminating her employment.

89.     As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by Defendant, Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, loss of earnings plus the value of certain benefits.

90.     Defendant's failure to compensate Plaintiff was knowing and purposeful.

91.     Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendant had no good faith basis to contest or dispute Plaintiff's right to receive overtime or an appropriate salary.

## COUNT VI
## (FSLA – FAILURE TO PAY WAGES)
## 29 U.S.C. §201 *et seq.*

92.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

93.     As set forth more fully above, Plaintiff sought payment of wages in exchange for the work that she performed for Defendant that was due and owing to her for performance of duties above and beyond those of the Executive Secretary and for her performance of overtime hours.

94.     Defendant failed to pay Plaintiff the wages that she earned and/or was entitled after terminating her employment.

95.     As a direct result of the aforesaid unlawful employment practices engaged in by Defendant, Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, loss of earnings plus the value of certain benefits.

96.     Defendan'ts failure to compensate Plaintiff was knowing and purposeful.

97.     Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendant had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Defendant.

## COUNT VII
## (PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW)
## 43 Cons. Stat. Ann § 260.1 *et seq.*

98.     Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

99.     Pursuant to Pennsylvania's Wage Payment and Collection Law ("WPCL"), every employer is obligated to pay all wages and wage supplements due to its employees. 43 Pa. Cons. Stat. Ann. § 260.3.

100.     Pursuant to the WPCL, an employer includes but is not limited to, "every person, firm or partnership, association, corporation receiver or . . . any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." *Id.,* at 260.2a.

101.     Pursuant to the WPCL, wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term 'wages' also includes fringe benefits or wage supplements." *Id.*

102.     Pursuant to the WPCL, wage supplements include "any other amount to be paid pursuant to an agreement to the employee." *Id.*

103.     As set forth fully above, Plaintiff completed a significant number of overtime hours for which she was not compensated, despite the fact that she was a non-exempt employee.

104.     Defendant is an "employer" pursuant to the WPCL, as it does business and employs people in the Commonwealth.

105.    Defendant's unlawful withholding of Plaintiff's compensation constitutes a violation of the WPCL.

106.    Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendant had no good faith basis to contest or dispute Plaintiff's right to receive compensation.

107.    Accordingly, pursuant to the WPCL, Plaintiff is also entitled to attorneys' fees and liquidated damages of 25% and all Defendants are **personally** liable for Plaintiff's wages, attorneys' fees and statutory liquidated damages. 43 Pa. Cons. Stat. Ann. §§ 260.9(a), 260.10.

## COUNT IV
### (PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW)
### 43 Cons. Stat. Ann § 260.1 *et seq.*

108.    Plaintiff hereby incorporates by reference all prior paragraphs as though set forth fully at length herein.

109.    Pursuant to Pennsylvania's Wage Payment and Collection Law ("WPCL"), every employer is obligated to pay all wages and wage supplements due to its employees. 43 Pa. Cons. Stat. Ann. § 260.3.

110.    Pursuant to the WPCL, an employer includes but is not limited to, "every person, firm or partnership, association, corporation receiver or . . . any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." *Id.,* at 260.2a.

111.    Pursuant to the WPCL, wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term 'wages' also includes fringe benefits or wage supplements." *Id.*

112.    Pursuant to the WPCL, wage supplements include "any other amount to be paid pursuant to an agreement to the employee." *Id.*

13

113.    As set forth fully above, Plaintiff completed a significant number of overtime hours for which she was not compensated, despite the fact that she was a non-exempt employee.

114.    Defendants' unlawful withholding of Plaintiff's compensation constitutes a violation of the WPCL.

115.    , the Argovian Shareholders, failed to pay Plaintiff her wages and/or wage supplements.

116.    Moreover, in light of Plaintiff's contributions to the company and fulfillment of her obligations under the employment arrangement, Defendants had no good faith basis to contest or dispute Plaintiff's right to receive compensation from Argovian.

117.    Accordingly, pursuant to the WPCL, Plaintiff is also entitled to attorneys' fees and liquidated damages of 25% and all Defendants are ***personally*** liable for Plaintiff's wages, attorneys' fees and statutory liquidated damages. 43 Pa. Cons. Stat. Ann. §§ 260.9(a), 260.10.

## DEMAND FOR JURY TRIAL

Egelkamp demands a jury trial on all counts of this Complaint.

**Wherefore**, Plaintiff prays for the following relief:

a.    Order Defendant to compensate Plaintiff for the full value of compensation and benefits she would have received had she not been the victim of sex discrimination, with interest thereon;

b.    Enter a judgment in favor of Plaintiff and against Defendant in the amount of Plaintiff's unpaid wages, including overtime compensation, and liquidated damages in an additional amount equal to back pay;

c.      Enter a judgment in favor of Plaintiff and against Defendant for compensatory and punitive damages under Title VII;

d.      Enter a judgment in favor of Plaintiff and against Defendant under the Equal Pay Act of 1963 in the amount of Plaintiff's unpaid wages, including overtime compensation, and liquidated damages in an additional amount equal to back pay;

e.      Enter a permanent injunction enjoining Defendant from discriminating or retaliating against Plaintiff in any manner that violates the Title VII or the Equal Pay Act of 1963;

f.      Order Defendant to pay Plaintiff the costs of this litigation, including reasonable attorneys' fees; and

g.      Plaintiff demands judgment in her favor and against Defendant, compensating her with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been terminated for Defendant's failure to compensate her, including an award of back pay, front pay, and pre-and post judgement interest, plus costs of suit and attorney and expert fees as allowed by law.  Plaintiff further demands liquidated damages under the FLSA and to the extent available, costs of suit and reasonable attorneys' fees.

h.      Plaintiff demands judgment in her favor and against Defendant, pursuant to the Pennsylvania Wage Payment and Collection Law, including an award of back pay, front pay, and pre-and post judgement interest, along with liquidated damages of 25%, attorneys' fees, and any such other relief this Court deems equitable and just.

i.      Grant Plaintiff such further legal and equitable relief as the Court may deem just and proper.

Respectfully Submitted,

**BOCHETTO & LENTZ, P.C.**

Date: August 19, 2019

By:        /s/ Bryan R. Lentz
Bryan R. Lentz, Esquire
Attorney ID No.: PA 71383
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
(215) 735-2455 fax
blentz@bochettoandlentz.com

*Attorney for Plaintiff*

Respectfully Submitted,

BOCHETTO & LENTZ, P.C.

Date: August 19, 2019

By:     /s/ Bryan R. Lentz
Bryan R. Lentz, Esquire
Attorney ID No.: PA 71383
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
(215) 735-2455 fax
blentz@bochettoandlentz.com

*Attorney for Plaintiff*