## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN H. EGELKAMP,<br>*Plaintiff,*<br><br>v.<br><br>ARCHDIOCESE OF PHILADELPHIA,<br>*Defendant.* | CIVIL ACTION<br>NO. 19-3734 |

**PAPPERT, J.**                                                        **May 18, 2021**

### <u>MEMORANDUM</u>

Karen Egelkamp sued her former employer the Archdiocese of Philadelphia for sex discrimination and retaliation in violation of Title VII and the Equal Pay Act of 1963. The Archdiocese moves for summary judgment on all claims. After carefully reviewing the parties' submissions and record evidence, as well as holding oral argument, the Court grants the motion with respect to the retaliation claims. The Court denies summary judgment on the discrimination claims because the record reveals factual issues for the jury's consideration as to the propriety of Egelkamp's compensation.

I

A

Egelkamp was hired as a full-time Executive Secretary with the Archdiocese's Office of Capital Projects in May 2001. (Def.'s Stmt. of Undisputed Material Facts ("Def.'s SOF"), ECF 30-1 ¶ 1.) Her starting annual salary was $31,000. (*Id.* ¶ 2.) She had an associate's degree in business administration and office management from the Community College of Philadelphia. (*Id.* ¶ 3.) She had never before worked for the

Archdiocese but had roughly fifteen years' experience as a "Recruiting Specialist, a "Senior Personnel Manager Administrative Assist[ant]" and an "Operations Manager Exec[utive] Assistant."  (Def.'s Ex D., ECF 30-7.)

Egelkamp's first supervisor at the Archdiocese was Arthur Friedman, who was Director of Capital Projects in 2001.  (Def.'s SOF, ECF 30-1 ¶ 4.)  Friedman joined the Archdiocese's headquarters in 1998, having worked for "other Archdiocesan-affiliated entities" for approximately thirteen years.  (*Id.* ¶ 6.)  Egelkamp understood that Friedman was hired to work in "general services" to "supervise the general maintenance staff and the print shop."  (Egelkamp Dep., Pl.'s Ex. A, ECF 31-6 at 79:9-20.)  She testified that Friedman had been a social worker at "St. Gabriel's" before he became the Director of Capital Projects.  (*Id.* at 79:1-4.)  Friedman had a bachelor's degree from the University of Northern Colorado and a master's degree from Villanova University.  (Def.'s SOF, ECF 30-1 ¶ 9.)  The record does not reveal the subject matter of Friedman's degrees, but the Archdiocese states he "had past experience in the field of social work."  (Def.'s Resp. to Pl.'s Counterstatement of Material Facts, ECF 32-3 ¶ 49.)  His 1998 salary was $52,000.  (*Id.* ¶ 8.)

Between 2001 and 2003, the Capital Projects department supervised projects involving large investments, including Archdiocesan building repairs and upgrades.  (*Id.* ¶ 10.)  Friedman "worked on the construction contracts, monitored projects, confirmed project funding, and communicated with pastors and project managers."  (*Id.* ¶ 14.)  He was "an active participant and presented at the Preconsultor and Archdiocese Building Committee Meetings" and attended meetings in City Hall and elsewhere in Philadelphia.  (*Id.* ¶ 15.)  Friedman also had responsibilities within the

Real Estate Services department.  Specifically, he "had signatory authority on all real estate documents" and signed purchase and sale agreements on the Archdiocese's behalf.  (*Id.* ¶ 16.)  Friedman facilitated real estate registrations and approved real estate letters, memos and financial confirmations.  (*Id.* ¶ 17.)  He also acted as the Archdiocese's representative at Real Estate Advisory Committee meetings. (*Id.* ¶ 18.) Sometime around 2003, Capital Projects and Real Estate Services merged into a single department:  the Office of Property Services.  (*Id.* ¶ 12.)  Friedman oversaw the combined office.  (*Id.*)  There is no other evidence in the record regarding the scope of Friedman's duties.  He left the Archdiocese in November 2011.  (*Id.* ¶ 19.)

After Friedman's departure, the Office of Property Services was reorganized and his responsibilities were divided between two positions: "Director for Property Services (Capital Projects)" and "Director for Real Estate Services."  (*Id.* ¶ 20.)  In December 2011 job descriptions, the Director of Property Services required a "[d]egree and license in architecture or engineering" and a "[m]inimum of ten years' experience in design and construction and facility management work . . ." and the Director of Real Estate Services required a "J.D./L.L.B. degree, together with broad-based experience in the fields of real property, real estate finance, business and corporate affairs and procedures, property tax and transactional matters . . . ."  (Def.'s Ex. F., ECF 30-9 at ECF p. 2-5.)  Jim Bock, the Archdiocese's Secretary for Temporal Services, oversaw both new positions.  (Def.'s SOF, ECF 30-1 ¶ 21.)

In an email announcing the organizational change, Bock explained that Egelkamp, Diane Berardinelli and John Kelly would continue to staff "the office." (Def.'s Ex. F., ECF 30-9 at ECF p. 7.)  He also wrote that O'Donnell and Naccarato, an

outside consulting firm, would "be providing day to day operational support on a temporary basis in the absence of the coordinator position." (*Id.*) Egelkamp testified that Liz Lawler, an O'Donnell and Nacarrato employee began to "come in two afternoons a week as a consultant to help with engineering." (Pl.'s Ex. A, ECF 31-6 at 137:1-2.) Lawler "would help if [Egelkamp] had questions," and the consulting firm was the "go-to" "if you needed something done quick . . . ." (*Id.* at 137:15-21.) Egelkamp disputes, however, that the firm provided "day-to-day operational support." (*Id.* at 137:3-11.)

Egelkamp testified that when Friedman left there was no posting for his position, and it was assumed that she would just do his work. (*Id.* at 89:1-5.) At the time, Bock told her he had confidence she could handle capital projects coordinator responsibilities and he said she "probably kn[e]w more about what[ was] going on" than Friedman had. (*Id.* at 152:2-20.) Egelkamp was listed in the Archdiocese's 2017 directory as Coordinator of Capital Projects – in an entry replacing one where Friedman had previously been listed. (*Id.* at 146:17-147:24; *see also* Pl.'s Ex. B, ECF 31-7.) She began to attend Building Committee Meetings in Friedman's place, although she was not a formal committee member. (ECF 32-3 ¶ 15.) She attended construction meetings so she could report the status of projects to Bock. (Pl.'s Ex. A., ECF 31-6 at 189:8-14.) She also coordinated catering for, attended and prepared minutes for Real Estate Advisory meetings. (ECF 32-3 ¶¶ 16-17.)

B

In May 2012, Bock hired Deacon Thomas Croke as the Director of Real Estate Services. (Def.'s SOF, ECF 30-1 ¶ 31.) He was an attorney with seven years of

litigation experience and twenty-one years of legal experience involving title insurance and real estate. (*Id.* ¶ 32.) In January 2015, after Bock asked him to add the Director of Property Services (Capital Projects) position to his responsibilities, Croke became Egelkamp's direct supervisor. (*Id.* ¶ 34.) He did not have a background in construction management and had not managed a construction project. (Croke Dep., Pl.'s Ex. E, ECF 31-10 at 167:20-168:1.) In fact, there is no evidence in the record that Croke met any of this position's posted requirements.

Egelkamp assisted Croke with some of Friedman's prior Capital Projects tasks, "including contacting pastors or business managers, preparing memoranda and letters, and compiling insurance-related documents and other contracts related to various projects." (Def.'s SOF, ECF 30-1 ¶ 37.) Egelkamp also scheduled, coordinated catering, and typed minutes for Real Estate Advisory Committee meetings. (*Id.* ¶ 42.) Croke testified that Egelkamp's responsibilities were "administrative. She was a secretary." (Croke Dep., Def.'s Ex. G, ECF 30-10 at 90:11-14.) According to him, before he became her supervisor, she "was doing the secretarial stuff on capital projects." (*Id.* at 129:23-130.) In his view, her work "was all administrative and clerical. It was typing, it was maintaining a file, it was copying and it was taking direction from Jim Bock." (*Id.* at 130:7-10.) Egelkamp also handled and addressed construction related calls. (Pl.'s Ex. A, ECF 31-6 at 235:1-18.) Unlike Friedman, Egelkamp never had signatory authority on real estate documents. (Def.'s SOF, ECF 30-1 ¶ 40.)

In October 2016, Croke asked Egelkamp to describe her job duties. (Pl.'s Counter-Statement of Material Facts, ECF 31 ¶ 24; *see also* Pl.'s Ex. D., ECF 31-9.) She wrote that her responsibilities included assigning project numbers to Pastors and

Secretariats and typing project registration letters, recommendation requests, approval/award letters, bid summaries and recommendations from the Property Services Director, Project Coordinator or Engineer. (Pl.'s Ex. D., ECF 31-9.) She updated project statuses in a database system, prepared College of Consultor memos, pre-consultor reports, parish confirmation reports, regional vicar reports and project status reports for Archdiocesan Building Committee and Pre-Consultors meetings. (*Id.*) Egelkamp also scheduled bid openings and project related meetings for the Director of Property Services and Building Committee Chairman. (*Id.*) She assisted the Director in preparing the annual departmental budget. (*Id.*) She ordered department supplies, coded and processed departmental accounts payable and accounts receivable, maintained and tracked departmental employee time and personnel records and coded and processed employee mileage and expense reports. (*Id.*)

In her "job description," Egelkamp also wrote that she had been "asked to assist with the additional duties of eliminated staff members," including bid and construction cost analysis, writing a bid summary and understanding building code requirements. (*Id.*) She testified she was facilitating or preparing projects for approval "at some level all day, every day." (Egelkamp Dep., Def.'s Ex. B, ECF 30-5 at 239:11-17.) Over time, certain responsibilities were reassigned to other employees because Egelkamp had complained to Bock and Croke that she could not keep up with her workload. (*Id.* at 264:2-5; Def.'s SOF, ECF 30-1 ¶ 43.) Reassigned duties included tasks related to timekeeping, invoices and assigning project registration numbers. (Def.'s SOF, ECF 30-1 ¶ 45.)

C

Egelkamp believes that she was paid less than Friedman because of her gender. (Pl.'s Ex. A, ECF 31-6 at 343:16-19.) She asked Maureen Gallagher to be paid more in 2012 because she "was doing Art Friedman's work duties . . . ." (Def.'s SOF, ECF 30-1 ¶¶ 79-80.) She asked Bock for a raise sometime in 2014 or 2015 (*Id.* ¶ 82.) After Croke "took over Property Services" in 2015 Egelkamp also asked him for "more pay." (*Id.* ¶ 92.) Croke told her he would discuss her request with Bock, who controlled Egelkamp's salary after Friedman's departure. (*Id.* ¶ 93; Pl.'s Ex. A., ECF 31-6 at 106:4-18.) Although Bock told Egelkamp the Archdiocese was "in the red," she received a one-time bonus signed by Bock's supervisor Monsignor Kutys in December 2015. (Def.'s SOF, ECF 30-1 ¶¶ 83-84.) Then, "about four months before October" 2017, during an argument with Croke, Egelkamp told him it was "against the law to not pay [her] what Art Friedman made." [1] (Pl.'s Ex. A, ECF 31-6 at 76:21-77:3.) She testified "his response was, well, obviously there's a difference between you and Art." (*Id.* at 343:8-10.) When she asked, "what would that be," he "never even lifted his head. He just kept his head down on his phone and he said, think about it." (*Id.* at 343:11-14.)

D

Egelkamp and Croke had "tensions . . . related to projects and things [she] wouldn't do." (*Id.* at 60:24-61:7.) She did not like him because in 2014 or 2015 he

---

[1] While Egelkamp testified the argument occurred "about four months before October" 2017, her Amended Complaint places the argument in "early 2017." (Am. Compl., ¶¶ 45-48.) In her interrogatory responses, she claimed the argument occurred on December 20, 2016. (Def.'s Mem. of Law, ECF 30-2 at 16.) Because all inferences must be drawn in Egelkamp's favor, the Court considers the argument to have occurred in or around June 2017 – *i.e.*, the latest date Egelkamp provided.

purportedly lied about a project at the Archdiocese in an email he did not realize she

had been copied on. (*Id.* at 61:14-62:3.) And she thought he "lied" about two other

projects. (*Id.* at 62:17-18.) She also thought he took offense when she offered to review

construction procedures with him "[be]cause he was real estate and the two had

different procedures . . . ." (*Id.* at 65:5-12.) In her view, Croke "was trying to push [her]

to quit" because he would blame her "for mistakes he made" and because she had asked

for a raise. (*Id.* at 68:6-15.)

According to Egelkamp, Croke had a problem with another woman as well – the

Archdiocese's female general counsel. (*Id.* at 92:6-11.) Egelkamp testified Croke asked

for "signature rights" for anything real estate related but "it was decided" he could not

have them. (*Id.* at 92:17-93:1.) After that, Egelkamp gave him a lease to review and he

told her to "send it up to legal." (*Id.* at 93:2-4.) When she said, "I thought you were

legal," he responded, "they don't want to let me have signature rights . . . with the

leases." (*Id.* at 93:5-8.) Croke then said, "that's what the problem is when you hire a

female as your general counsel, there's a head problem, an ego problem." (*Id.* at 93:8-

11.) Egelkamp testified Croke "would roll his eyes" "if there was an issue," like once

when the general counsel would not prepare a contract. (*Id.* at 94:6-13.) Egelkamp

said when the general counsel would sit in on real estate advisory meetings, Croke

would ask if Egelkamp had invited her and told Egelkamp "in the future don't give [the

female general counsel] a copy of the minutes; she wasn't invited." (*Id.* at 95:1-7.)

E

In October 2017, Croke wrote a memo to Bock stating that he "intend[ed] to

terminate" Egelkamp. (Def.'s Ex. K, ECF 30-14, ECF p. 4.) He believed Egelkamp had

used meal tickets "in an unauthorized fashion." (*Id.*) He said that Williamson Hospitality, the Archdiocese's catering vendor, had asked about "apparent irregular transactions in the cafeteria using Luncheon Tickets" charged to Property Services. (*Id.*) After meeting with Williamson, Croke said he found just $79.43 in "clearly authorized" tickets out of $695.79 in total. (*Id.*) He wrote that "Egelkamp signed for several tickets totaling $145.98 and there does not appear to be any authorization or appropriate reason for their use." (*Id.*) He noted $470.38 in other tickets "did not contain an employee signature," but in his opinion, based on a comparison of the handwriting on unsigned tickets to those Egelkamp had signed, he attributed them to Egelkamp. (*Id.*) Croke concluded Egelkamp had "misappropriated . . . Luncheon Tickets totaling $616.36 during the calendar year 2017." (*Id.*) He supported his decision to fire Egelkamp with a provision in the Archdiocese's Lay Employee Handbook making transgressions including "falsification or misrepresentation of reports and records," "misappropriation of funds," or "unauthorized personal use of archdiocesan services" ethical conduct violations that could "lead to various degrees of discipline up to and including termination . . . ." (*Id.*)

Egelkamp is adamant she did not misuse lunch tickets. (Pl.'s Ex. A, ECF 31-6 at 276:18-22.) First of all, the Archdiocese did not have a written policy governing the use of meal tickets. (Croke Dep., Pl.'s Ex. E, ECF 21-10 at 15:18-22.). Tickets were charged to their users' department budgets. (Def.'s SOF, ECF 30-1 ¶ 51.) Different departments used tickets for different purposes, and it would not have been unusual to use them for events or meetings. (ECF 32-3 ¶¶ 61-62.) They were routinely provided to clergy and other religious employees and occasionally given to lay visitors. (Def.'s SOF,

ECF 30-1, ¶ 50.)  In 2003, Egelkamp and Friedman discussed her ability to use meal tickets if she was going to work through lunch.  (Pl.'s Ex. A., ECF 31-6 at 276:23-277:5.) She never discussed with Bock whether she could use the tickets when working through lunch.  (*Id.* at 277:6-10.)  When Croke took over Property Services in 2015, he never asked Bock what the department's meal ticket policy had been under Friedman or otherwise.  (Pl.'s Ex. E, ECF 21-10 at 32:10-14.)  Asked about the meal ticket policy on his watch, Croke said "I determined who got lunch tickets and when." (*Id.* at 34:17-24.)  However, Croke never told his staff what his meal ticket rules were and acknowledged he had "no idea" how his subordinates would have known his policy.  (*Id.* at 24:2-5, 35:2-13.)

The Archdiocese suspended Egelkamp on October 24, 2017.  (Def.'s SOF, ECF 30-1 ¶ 64.)  On October 26, the Archdiocese's Director of Investigations Albert J. Toczydlowski and Investigator Frank Mastrangelo met with Croke about the alleged misuse of meal tickets.  (Def.'s Ex. K, ECF 30-14, ECF p. 2.)  Mastrangelo was asked to determine the dollar amount of meal tickets at issue.  (Mastrangelo Dep., Pl.'s Ex. L., 22:15-17.)  Because the amount "was under $2,000, the matter went back to th[e] respective department head for them to act on." (*Id.* at 22:11-14.)  Mastrangelo testified the investigation did not address whether Egelkamp's "claim of prior supervisory approval should be accepted." (*Id.* at 22:4-11.)  She was not interviewed because the dollar amount did not rise to the level of a criminal referral.  (*Id.* at 28:6-10.)

On November 14, 2017, the Archdiocese terminated Egelkamp for her alleged misuse of meal tickets.  (Def.'s SOF, ECF 30-1 ¶ 72.)  It told the Pennsylvania Unemployment Office she had been terminated for "misconduct" and "violation of

diocesean policy relating to faith or morals." (*Id.* ¶ 73.)  At the time she was let go, Egelkamp's annual salary was $44,800.  (*Id.* ¶ 118.)

## II

Summary judgment is proper if the movant proves that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  A fact is "material" if it may affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 256.

At summary judgment, a court may consider any material in the record that may be admissible at trial.  *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999).  In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  Nor may a court make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

III

A

Egelkamp claims the Archdiocese paid her less and otherwise deprived her of employment opportunities because of her sex. (*See* Am. Compl., ECF 2 ¶¶ 74-77.) Title VII makes it an "unlawful employment practice for an employer to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). "[I]f changing the employee's sex would have yielded a different choice by the employer—a [Title VII] violation has occurred." *Bostock v. Clayton Cnty., Georgia*, --- U.S. ----, 140 S. Ct. 1731, 1741, 207 L. Ed. 2d 218 (2020).

1

Egelkamp's Title VII discrimination claim is governed by the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). To make out a prima facie case, Egelkamp must show she: (1) belongs to a protected class; (2) was qualified for her position; (3) suffered an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). Establishing a prima facie case is not a heavy burden. *McDonnell Douglas*, 411 U.S. at 802.

In the absence of direct evidence, "[d]iscrimination may be inferred based on comparator evidence – evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citation omitted); *see also Texas*

*Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."). Egelkamp must accordingly show she was performing work substantially equal to that of male employees who were compensated at higher rates than she was. *See Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 395 (M.D. Pa. 2016) (explaining "courts have recognized that the disposition of claims brought pursuant to the Equal Pay Act 'are authoritative' in cases where plaintiffs also 'raise a claim of equal pay' under Title VII"), aff'd 715 F. App'x 179 (3d Cir. 2017). The Archdiocese argues Egelkamp cannot establish a prima facie case of Title VII discrimination because she has not shown Friedman, who was paid more, is an appropriate comparator.[2] (Def.'s Mem. of Law, ECF 30-2 at 11.)

"While similarly situated does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). "Which factors are relevant is determined by the context of each case . . . ." *Id.* They may include whether the employees shared a supervisor, their job descriptions, standards they had to meet and their workplace conduct. *Id.* This analysis is "a fact-intensive inquiry based on a whole constellation of factors." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 306 (3d Cir. 2004). "As a general rule, whether individuals are similarly situated is a factual question for the jury.

---

[2]     The Archdiocese does not contend in its briefing that Egelkamp did not suffer an adverse employment action and the issue did not arise at oral argument. Subsequently, the Court asked for letter briefs "as to whether not paying Egelkamp additional salary for doing work substantially similar to Friedman constitutes an adverse employment action for purposes of a Title VII claim" (ECF 37) and the parties submitted their respective positions. (ECF 38 and 39.) Having reviewed their positions, the Court agrees with Egelkamp that "paying an individual a lower salary for discriminatory reasons can be an adverse employment action," *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 73 (3d Cir. 2003), and this element of her prima facie case is a jury question.

However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)).

On this record, the Court cannot conclude as a matter of law that Friedman is an inappropriate comparator. Friedman and Egelkamp were not identically situated. He formally supervised some employees during his tenure. She did not. Their job titles were not the same. Friedman had more years of formal education than Egelkamp. He had signatory authority for real estate documents that she lacked. But construing the record in the light most favorable to her, there is overlap between their work raising questions for the jury as to whether they were similarly situated in all relevant respects despite their different salaries. Neither arrived at the Archdiocese with particular real estate experience. Friedman had been a social worker while Egelkamp worked in recruiting and as an executive or administrative assistant. Nevertheless, both worked on real estate related matters for the Archdiocese for a similar number of years – Friedman from 1998 to 2011 and Egelkamp from 2001 to 2017. Both were involved with opening bids. (Pl.'s Ex. A, ECF 31-6 at 118:1-4; 188:15-21.) Both attended Archdiocese Building Committee meetings. (Def.'s Resp. to Pl.'s Counterstatement of Material Facts, ECF 32-3 ¶ 15.) Both reported, at least for a time, to Bock. When Friedman left the Archdiocese, Egelkamp assumed at least some of his duties. The jurors must decide whether or not the two of them were "similarly situated."

2

Assuming Friedman is an appropriate comparator, the burden shifts to the

Archdiocese to articulate some legitimate, nondiscriminatory reason" for paying

Egelkamp less than him. *See Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

(alteration in original omitted) (holding the defendant must "offer a legitimate non-

discriminatory justification for the adverse employment action.") (citation omitted). A

defendant "answers its relatively light burden" of production by "introducing evidence

which, taken as true, would permit the conclusion that there was a [legitimate] reason

for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.

1994) (citations omitted).

The Archdiocese contends Friedman was "paid more because he was more

qualified, had more years of service with the Archdiocese, and had significant

experience with supervising employees and managing departments." (Def.'s Mem. of

Law, ECF 30-2 at 11.) It also argues Friedman had significantly greater

responsibilities than Egelkamp. (*Id.*) Taking the Archdiocese's evidence as true, it

points to sufficient facts to meet its relatively light burden.

3

As a result, Egelkamp must then "provide evidence from which a factfinder could

reasonably infer that [the Archdiocese's] proffered justification is merely a pretext for

discrimination." *Burton*, 707 F.3d at 426. She "must point to some evidence, direct or

circumstantial, from which a factfinder could reasonably either (1) disbelieve the

employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action." *Id.* at 427 (citation omitted). She has to do more than show that

the Archdiocese's decision to pay her less than Friedman "was wrong or mistaken."

*Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992). She must establish its proffered legitimate reasons for paying her less have "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions . . . that a reasonable factfinder could rationally find them unworthy of credence . . . ." *Fuentes*, 32 F.3d at 765 (citation and internal quotations omitted). She cannot rely on her own subjective belief to support her claim. *Cf. Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014) (holding the plaintiff's "subjective belief" her race drove the claimed adverse actions was "not sufficient to establish an inference of discrimination"); *Miller v. Lehigh Univ.,* No. 19-00965, 2020 WL 832095, at *10 (E.D. Pa. Feb. 20, 2020) (finding the plaintiff did not meet her burden where she "offer[ed] nothing to suggest" her employer's stated reasons for the claimed adverse action were pretextual).

Egelkamp may use evidence offered in support of her prima facie case to establish pretext. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("As our cases have recognized, almost in passing, evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other."); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("The prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic."); *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990) ("[T]he McDonnell Douglas prima facie test should not be viewed as a rigid formula.") (citation omitted). As set forth above, there is a genuine dispute about whether Egelkamp and Friedman had similar job duties, a dispute that might permit

the jury to infer that the salary differential between them was based on her sex.

In addition, Egelkamp cites Croke's apparent disfavor of the Archdiocese's female general counsel and his comment that "when you hire a female as your general counsel, there's a head problem, an ego problem." (Pl.'s Ex. A, ECF 31-6 at 93:8-11.) Perhaps more importantly, she offers Croke's response to her protestation that it was "against the law" to pay her less than Friedman: that "obviously there's a difference between you and Art." (*Id.* at 343:8-10.) Croke's remarks may be probative of pretext when considering (1) his relationship to Egelkamp and their places within the Archdocese's organization; (2) the temporal proximity of his statements to the decision to pay her less than Friedman had been paid; and (3) "the purpose and content of the statement." *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 133 (3d Cir. 1997) (citation omitted).

The Archdiocese characterizes Croke's comment about the general counsel as a "stray remark" and contends it should not be given weight because he "did not have independent control over [Egelkamp's] salary." (Def.'s Mem. of Law, ECF 30-2 at 12.) However, Croke was Egelkamp's direct supervisor. Even if he "needed Jim Bock's approval for issues involving [her] salary," (Def.'s Mem. of Law, ECF 30-2 at 12), there is no evidence Croke did not influence decisions regarding her privileges of employment. Indeed, Egelkamp was ultimately terminated based on Croke's recommendation. None of his comments are properly characterized as "stray remarks," because he is not a "decisionmaker[ ] unrelated to the decision process . . . ." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

The Archdiocese argues Egelkamp offers "nothing more than unsupported

speculation to suggest that her gender had anything to do with [Croke's other] comment." Nevertheless, the Court is required to draw inferences in Egelkamp's favor and it may infer from her supervisor's comment that she should "think about" the difference between her and Friedman that her sex had something to do with the difference in their pay. The Third Circuit found a similarly ambiguous statement probative of "discriminatory animus" in an age discrimination suit. *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 333 (3d Cir. 1995). The defendant's personnel manager had written in a performance review memorandum that the plaintiff was "53 years old, which presents another problem." *Id.* The Third Circuit explained that although the jury might find the comment "merely reflects an awareness of [the defendant's] legal obligations, the statement is also subject to competing interpretations. Another reasonable interpretation is that [the plaintiff's] age was a problem" for the Defendant. *Id.* It held the statement should be "submitted for the jury's consideration." *Id.* Croke's comment is also "subject to competing interpretations" and Egelkamp may use it to support her claim. A reasonable jury, weighing the credibility of the relevant witnesses, could find that Egelkamp was paid less than Friedman because of her gender even though there was substantial similarity between their responsibilities and relevant experience. When the record evidence is considered as a whole and reviewed in the light most favorable to Egelkamp, a factfinder could, at minimum, disbelieve the Archdiocese's reasons for paying Egelkamp less than Friedman.

B

Egelkamp claims the Archdiocese also violated the Equal Pay Act by paying

18

Friedman more than her. (*See* Am. Compl. ECF 2, ¶¶ 81-84.) The Act requires equal pay for jobs requiring "equal skill, effort and responsibility . . . performed under similar working conditions . . . ." 29 U.S.C. § 206(d). Equal Pay Act discrimination claims, unlike Title VII claims, require a two-step burden shifting analysis. *See Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000). Egelkamp must first show "employees of the opposite sex were paid differently for performing 'equal work' – work of substantially equal skill, effort and responsibility, under similar working conditions." *Id.* (citations omitted). "The burden of persuasion then shifts to the employer to demonstrate the applicability of one of the four affirmative defenses specified in the Act." *Id.* A pay difference is permissible if it is "made pursuant to (i) a seniority system; (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based upon any other factor other than sex" (the "catchall" exception). 29 U.S.C. § 206(d)(1).

1

"Congress did not intend to limit the applicability of the Equal Pay Act to cases involving identical work . . . ." *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 155 (3d Cir. 1985). "The crucial finding . . . is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Id.* at 156. "The inquiry then turns to whether the differing or additional tasks make the work substantially different." *Id.* "Ultimately, a finding that jobs entail equal work must be decided on a case-by-case basis." *Puchakjian v. Twp. of Winslow*, 804 F.Supp.2d 288, 295 (D.N.J. 2011), aff'd, 520 F. App'x 73 (3d Cir. 2013). "Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate." *Brobst*, 761 F.2d at

156.

The Archdiocese contends Friedman had more skill, exerted more effort and had substantially greater responsibilities than Egelkamp. (Def.'s Mem. of Law, ECF 3-2 at 8.) Again, the record reveals issues of material fact as to whether this is true. For the same reasons that there is a factual dispute as to whether Egelkamp and Friedman were "similarly situated" for purposes of her Title VII claim, there is also a triable issue as to whether they performed "equal work" for purposes of her Equal Pay Act claim.

2

The Archdiocese argues that even if Egelkamp can establish a prima facie case of Equal Pay Act discrimination, summary judgment is still appropriate pursuant to the "catchall" affirmative defense because any pay differential was based on factors other than sex. (Def.'s Mem. of Law, ECF 30-2 at 8.) The Archdiocese compares the degrees held by Friedman and Egelkamp when they were hired, cites their prior employment roles and argues Friedman was paid more because he was more qualified, had more years of service with the Archdiocese and had significant experience as a supervisor and department manager. (*Id.* at 8-9.) "The Defendant's burden here is higher than a typical Title VII claim . . . ." *Fuller v. Glob. Custom Decorating*, No. 04-285, 2007 WL 44507, at *10 (W.D. Pa. Jan. 5, 2007). To meet its burden of persuasion with respect to the catchall affirmative defense in 29 U.S.C. § 206(d)(1)(iv), it must establish a differential between Egelkamp and Friedman based on any factor other than sex "'so clearly that no rational jury could find to the contrary.'" *Stanziale*, 200 F.3d at 107 (quoting *E.E.O.C. v. State of Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1414 (3d Cir. 1989)).

Friedman and Egelkamp had different work experiences and educational backgrounds when they arrived at the Archdiocese, but this is not enough to show that their resumés "actually motivated" their different rates of pay where there is no evidence either had prior experience relevant to real estate or construction. *Barthelemy v. Moon Area Sch. Dist.*, No. 16-0542, 2020 WL 1899149, at *14 (W.D. Pa. Apr. 16, 2020). There is no testimony or other evidence showing how the Archdiocese establishes employee pay in general or about the criteria used to initially establish and later adjust Friedman's and/or Egelkamp's annual pay. The Archiocese has not set forth enough evidence to show its gender-neutral reasons "*do in fact* explain the wage disparity." *Stanziale*, 200 F.3d at 108 (emphasis in original); *see also Maresca v. Port Auth. of N.Y. & NJ,* No. 10-1055, 2012 WL 6728560, at *5 (D.N.J. Dec. 27, 2012) (denying summary judgment where "the existence of a true policy [about salaries], as opposed to an *ad hoc* practice, [wa]s unclear").

## D

Egelkamp asserts that but for her complaint about her compensation, she would not have been terminated in violation of both Title VII and the Equal Pay Act.[3] Her retaliation claims can be considered together because the *McDonnell Douglas* burden-shifting framework applies to each. *See Carvalho-Grevious v. Delaware State Univ.,* 851 F.3d 249, 257 (3d Cir. 2017) (*Title VII retaliation); *Marriott v. Audiovox Corp.*, No. 04-1307, 2006 WL 3805145, at *8-9 (W.D. Pa. Dec. 22, 2006) (Equal Pay Act retaliation). To establish her prima facie retaliation case, Egelkamp must show:

---

[3]     Counsel withdrew at oral argument Count V, asserting a separate claim for retaliatory termination under the Fair Labor Standards Act. (April 27, 2021 Oral Arg. Hr'g Tr. at 4:7-23; *see* Am. Compl. ECF 2 ¶¶ 87-93).

(1) she engaged in protected activity; (2) the Archdiocese took an adverse employment action against her; and (3) there is a causal link between her protected activity and the adverse action.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citations omitted).

1

The Archdiocese contends Egelkamp never made a formal complaint about Croke's refusal to increase her salary.  (Def.'s Mem., ECF 30-2 at 15.)  However, "protected activity includes not only formal charges of discrimination, but also 'informal protests of discriminatory employment practices, including making complaints to management.'" *Curay-Cramer v. Ursuline Acad. of Wilmington, Del.*, 450 F.3d 130, 135 (3d Cir. 2006) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). What matters is "the message being conveyed rather than the means of conveyance." *Id.*  A complaint can be written or oral but must be sufficiently clear and detailed so that an employer can understand it as an assertion of rights protected by the statute. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

The Archdiocese acknowledges Egelkamp complained to Croke that it was "against the law to not pay [her] what Art Friedman made."  (Def.'s Mem. of Law, ECF 30-2 at 16.)  This is enough to show that Egelkamp "had an objectively reasonable belief, in good faith, that her complaint concerned a violation of the EPA [or] Title VII . . . ."  *Briscella v. Univ. of Pa. Health Sys.*, No. 16-614, 2018 WL 6413305, at *8 (E.D. Pa. Dec. 4, 2018).

2

There is no dispute the Archdiocese took an adverse employment action against

Egelkamp. She was suspended on October 24, 2017 (Def.'s SOF, ECF 30-1, ¶ 64) and fired on November 14, 2017. (*Id.* ¶ 72.) The question is whether she can show a causal link between those actions and her June 2017 complaint about her compensation. "[A] plaintiff alleging retaliation has a lesser causal burden at the prima facie stage." *Carvalho-Grevious*, 851 F.3d at 259. Even then, she "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'" *Id.* (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis in *Carvalho-Grevious*)). Egelkamp may use a "broad array of evidence" to do this. *Farrell*, 206 F.3d at 284.

Temporal proximity alone, when "very close," can in some instances suffice to create an inference of causation. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74. "[T]here is no bright-line rule as to what amount of time is unusually suggestive." *LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d. Cir. 2007). But "very close" generally means "within a few days," not a gap of three and a half or four months, like the one here between Egelkamp's complaint to Croke and her suspension and subsequent termination. *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017) (collecting cases); *see Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) ("We have . . . held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive[.]"); *see also LeBoon*, 503 F.3d, at 233 ("[A] gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Where, as here, temporal proximity is not "unusually suggestive," the Court may

consider whether "the proffered evidence, looked at as a whole" is enough to raise the inference of a causal connection. *Farrell*, 206 F.3d at 280 (internal citation and quotation marks omitted). Ongoing antagonism, an inconsistent explanation for the adverse action or "other types of circumstantial evidence that support the inference" may be used to "substantiate a causal connection for purposes of the prima facie case . . . ." *Id* at 280-81.

The record here contains no such evidence upon which a juror could rely to find the Archdiocese's investigation into Egelkamp's meal ticket use related to her complaint about her pay. There is no record evidence that Croke acted differently toward her after their argument about her pay. There is no evidence of inconsistent explanations for her termination; to the contrary, the Archdiocese has only ever proffered one reason for her suspension and termination. No evidence links Egelkamp's pay complaint to Croke's meal ticket investigation. Indeed, Croke did not initiate the investigation; it began only after Williamson, a disinterested third-party, alerted him about "irregular" transactions. Without more, Egelkamp's personal belief that she was fired because she complained to Croke about being paid less than Friedman is not enough to create an inference that her complaint was the likely reason for her eventual suspension and subsequent termination.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.